UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

KEVIN M. MCCARTY,

CASE NO.: 4:96CV420-MP

　　　Plaintiff,

v.

BANKERS INSURANCE COMPANY, INC.,
DAVID K. MEEHAN, individually, and
in his corporate capacity, GEORGE
K. DELANO, individually and in his
corporate capacity, PETER R. RAYNER,
individually and in his corporate
capacity, NATIVE SON INVESTIGATIONS,
INC., (f/d/a/ ACUMEN INVESTIGATIONS),
RICHARD H. MATTHEWS, individually,
and EDWIN F. BLANTON, individually,
and doing business as OFFICE OF
EDWIN F. BLANTON, ATTORNEY,

　　　Defendants.
_____

DEFENDANT BANKERS INSURANCE COMPANY, DAVID K. MEEHAN, AND
GEORGE K. DELANO'S MOTION FOR SUMMARY JUDGMENT
AND
INCLUDED MEMORANDUM OF LAW

　　　Defendants Bankers Insurance Company (Bankers), David K.
Meehan (Meehan), and George K. Delano (Delano), by and through the
undersigned attorneys and pursuant to Fed. R. Civ. P. 56, move for
entry of summary judgment on all of the claims brought against them
in the First Amended Complaint (hereinafter complaint).　These
claims are contained in Counts II, IV, V, VI, VIII, X, XI, XII,
XIII, XIV, XV, XVII, XVIII, XIX, XX, XXII, XXIII, XXIV, XXV, XXVII,

XXVIII, XXIX, XXXII, XXXVI, XXXVII, XXXVIII, XXXIX, XXXIX, XL, and XLI.

These defendants, pursuant to Fed. R. Civ. 12(b), and their first, fourth and fifth affirmative defenses, also move for entry of an order dismissing this action against them for lack of jurisdiction.

### RULE 56(d) REQUEST

In the sole event summary judgment is not entered upon plaintiff's entire case against defendants Bankers, Meehan and Delano, these defendants request the Court pursuant to Rule 56(d), to ascertain what material facts exist without substantial controversy and what material facts are actually in good faith controverted and, based upon those findings, to enter an order specifying the facts that appear without substantial controversy and providing that at the trial of this cause those facts will be deemed established, so that the trial can be conducted accordingly.

### N.D. FLA. LOC. R. 7.1(B)

In accordance with N.D. Fla. Loc. R. 7.1(B), the movants' undersigned attorney has attempted to confer with plaintiff's attorney in a good faith effort to resolve by agreement the issues raised by this motion, but has been unsuccessful, despite a telephone call and faxed letter to plaintiff's attorney.

The particular grounds upon which this motion is based are:

### I.   BASIC FACTS

Since May of 1991 defendant Delano has been the general counsel and corporate secretary of Bankers Insurance Company, whose

headquarters are in St. Petersburg.  Immediately before going with Bankers, Delano practiced transactional law with the firm of Harris, Barrett, Mann and Dew in St. Petersburg.  He started with that firm after graduating from law school in August of 1976.[1]

From 1991 to the present, plaintiff McCarty has been employed by the State of Florida, Department of Insurance with regulatory responsibility for the Florida Residential Property Casualty Joint Underwriters Association (FRPCJUA), the Florida Property Casualty Joint Underwriters Association (FPCJUA), and the Auto Joint Underwriters Association (Auto JUA).[2]

In late March or early April of 1995, because it was clear to Bankers that McCarty had no regard for the law and was given to frequent abuse of his authority and because Bankers did not know why,[3] Delano suggested to Robert Menke, the Chairman of the Board of Bankers, that Bankers might hire a private investigator to gather information on McCarty to find out what was motivating him.[4]

Examples of McCarty's disregard for the law and abuse of authority are:

1.   McCarty's participation in the reassignment of insurance agents who had requested Bankers as their servicing carrier under the Florida Residential Property Casualty Joint Underwriting

---

[1]   Delano deposition pages 15 line 8 through page 17 line 1.

[2]   McCarty Deposition page 16 line 21 through page 19 line 3.

[3]   Delano deposition page 38 line 20 through page 39 line 5.

[4]   Delano deposition page 100 lines 9-13.

Association (FRPCJUA), since under the applicable Florida Statutes, the agent had the right to select the insurer.   When Delano complained to the chief executive of the FRPCJUA, it was reported to Delano that McCarty ordered an audit of Bankers' performance of its contract with the FRPCJUA.   Delano deposition page 50 line 14 through page 51 line 7.

2.    When the audit was completed in 1993 it was not presented to Bankers for comment or opportunity to request formal or informal hearing, as required by Florida Statutes.   Until the audit is presented to the company it is confidential.   However, in February of 1994, before it was presented to Bankers, McCarty wrote the CEO of the FRPCJUA and informed him that the audit showed substantial problems and that the FRPCJUA should discontinue doing any new business with Bankers.   Delano deposition page 58 line 16 through page 59 line 12.

3.    McCarty directed Madeline McGuckin, a lawyer with the Department of Insurance, to distribute to third parties a confidential audit of the Florida Windstorm Pool.   Delano deposition page 69 line through page 70 line 13.

Due to the foregoing, Delano and Meehan decided to hire a Tallahassee attorney to identify and engage the services of a private investigator who would have the ability to gather information on McCarty.[5]  They agreed on defendant Edwin F. Blanton because, although Delano was not familiar with many lawyers in

---

[5]  Delano deposition page 104.

4

Tallahassee, he had met Mr. Blanton at the funeral of George Meehan, one of his (Delano's) former law partners. George Meehan had always spoken very highly of Mr. Blanton and Delano held George Meehan in the highest respect because he (Meehan) had excellent judgment, was an excellent lawyer and had been his former firm's managing partner.[6] As a result, Delano suggested Blanton to Mr. Menke who advised that Blanton had represented Bankers on some matters in the past. Therefore, Blanton seemed like the right choice.[7]

After Delano and Menke made the decision to investigate McCarty, they met with defendant David Meehan to inform him of their intentions. Delano does not recall whether this was before or after he had contacted Blanton.[8]

There were only a couple of conversations between or among Delano, Meehan and Menke regarding the investigation. The first was when Delano and Meehan decided to have the investigation undertaken and the other was when they said that because the investigation had been a waste of time it should be stopped.[9] However, their discussions were not specific as to the details of the investigation, but addressed only the general purpose of the

---

[6]   Delano deposition page 113.

[7]   Delano deposition page 113.

[8]   Delano deposition page 107.

[9]   Delano deposition page 95 lines 16-23.

5

investigation.[10]  After these initial conversations, Delano did not communicate with Meehan and Menke regarding the investigation until it was determined that the investigation should be terminated.[11] Furthermore, although Delano and Blanton exchanged correspondence and although Blanton forwarded to Delano the two reports prepared by defendant Rayner, the private investigator who conducted the investigation, Delano kept those materials in a folder in his desk and neither Menke nor Meehan ever saw them.[12]

Delano's first contact with Blanton regarding the investigation was a phone call on or about 20 April 1995 during which they discussed the kind of information Delano was seeking and the nature of the investigation.[13]  Delano told Blanton that he wanted a thorough investigation[14] but he did not instruct Blanton as to how to conduct the investigation.[15]  And, he did not tell Blanton the means to be used in conducting the investigation.[16] By thorough investigation he meant current sources of income that might be improper, criminal or other record which might indicate

---

[10]  Delano deposition page 106 lines 13-25.

[11]  Delano deposition page 141.

[12]  Delano deposition page 114 line 11 through page 121 line 23.

[13]  Delano deposition page 112 line 7 through page 113 line 4, and page 141 lines 9-18.

[14]  Delano deposition page 143 lines 18-24.

[15]  Delano deposition pages 143 and 161.

[16]  Delano deposition page 161.

dishonesty, and current romantic involvements.[17]  Delano relied on Blanton as to how to gather the information[18], and Delano never communicated with Rayner.[19]

During Delano's initial telephone conference with Blanton, Blanton expressed concern about the fact that the type of investigation which Delano was requesting might be used for extortion or blackmail.  They discussed this fact and they wanted to assure each other that the information obtained was not going to be used for any such purpose.  It is for that reason that Delano stated in his 20 April 1995 letter to Blanton that:[20]

> I explained to you that we have no intention of committing extortion or any such thing.  Instead, depending upon what kind of information might be developed it might be appropriate to take it to the Department's General Counsel, to the Commissioner or to the Florida Attorney General.

In addition to discussing Delano's desire for a legal investigation during his initial conversation with Mr. Blanton, Delano's desire for a legal investigation never varied.[21]

---

[17]  Delano's 4/20/95 letter to Blanton.  A copy of the letter is attached hereto as Exhibit A.  It was contained as part of these defendants' privileged document log attached to Bankers, Meehan, and Delano's notice of in-camera filing of documents [Doc. #151]. Pursuant to the Unopposed Protection Order [Doc. #203] these documents have been produced to the parties.

[18]  Delano deposition page 162.

[19]  Delano deposition page 161.

[20]  Delano deposition pages 146-147.

[21]  Delano deposition page 143.

Delano did not instruct Blanton on how to conduct the investigation or talk with him regarding the "means or where or when" of the investigation.[22]  Delano merely asked Blanton for his help with getting an investigation of McCarty.[23]

Based on a recommendation from Dino Kitchen, a Tallahassee lawyer, Blanton talked by telephone with defendant Rayner (who at that time was a licensed private investigator) and arranged an office conference for the two to meet.[24]  That office conference was on April 26 at which time Blanton advised that his client was an insurance company which was being given a hard time by Kevin McCarty, an employee of the Department of Insurance, and that the insurance company wanted to see if a motive could be found for McCarty doing so.[25]

Rayner suggested an investigation into McCarty's background, which would include his financial status, past legal problems, sources of income, and whether there was a relationship in his life which would serve as motivation for McCarty giving the insurance company a hard time.[26]  The plan for conducting the background investigation was a search of public records, the use of computer databases, and using an investigative business which would provide

---

[22]  Delano deposition page 159.

[23]  Delano deposition page 159.

[24]  Rayner 9/16/97 deposition page 88, lines 5-6.

[25]  Rayner 9/16/97 deposition pages 49 and 60.

[26]  Rayner 9/16/97 deposition page 61 line 21 through page 62 line 20.

8

information into McCarty's finances and the long distance telephone numbers McCarty had called.  Blanton and Rayner discussed doing the background investigation first and then determining what the next step would be, based upon the information revealed by the background investigation.  Although surveillance was discussed, Mr. Rayner advised that until the background information had been obtained, surveillance would be premature.[27]

To perform the computer database searches Mr. Rayner retained the services of Howard Investigations.[28]  To obtain the financial information and long distance telephone information Mr. Rayner retained Discovery & Location Services.[29]  Mr. Rayner paid the expenses for these services out of the funds he received from Mr. Blanton.

By letter dated 27 April 1995, Mr. Blanton advised Delano that he had retained Mr. Rayner.[30]

Thereafter, Blanton sent Delano Rayner's initial report dated 27 May 1995 which was "pretty much a database search".[31] Rayner's

---

[27]  Rayner 9/16/97 deposition page 63 line 5 through page 66 line 9.

[28]  Rayner 9/16/97 deposition page 88 lines 5-6.

[29]  Rayner 9/16/97 deposition pages 76 line 17 through page 77 line 6.

[30]   This letter is contained as part of these defendants' privileged document log attached to Bankers, Meehan, and Delano's notice of in-camera filing of documents [Doc. #151].  Pursuant to the Unopposed Protective Order [Doc. #203] these documents were produced to the parties.

[31]  Delano deposition page 141 lines 23-24.

9

report suggested (1) conducting a record search in the Gainesville, Orlando, Tampa and St. Petersburg areas and (2) that McCarty be placed under surveillance in order to learn more about his current activities.[32]  Although Delano and Blanton discussed that Rayner was going to perform surveillance, Delano did not give any instructions as to the means of conducting that surveillance[33] and although Delano recalls talking about pictures and different surveillance techniques, he does not recall talking about obtaining a videotape of McCarty and he did not instruct Blanton to obtain video footage of McCarty engaged in sexual activities.[34]

In fact, although Rayner did surveil McCarty, that surveillance was always in areas open to the public[35] and even though Blanton did instruct Rayner to obtain videotape of the surveillance, it was understood that if any videotaping was done it would be in a public place and Rayner was never requested to videotape in any place other than a public place.[36]  In fact, Rayner

---

[32]  Rayner's 27 May 1995 letter to Blanton.  This letter is contained as part of these defendants' privileged document log attached to Bankers, Meehan, and Delano's notice of in-camera filing of documents [Doc. #151].  Pursuant to the Unopposed Protective Order [Doc. #203] these documents were produced to the parties.

[33]  Delano deposition page 161 lines 23-25.

[34]  Delano deposition page 157-158.

[35]  Rayner's reports of surveillance, which are exhibit 17 to Rayner's 9/16/97 deposition.  A copy has been filed as part of these defendants' notice of filing portions of depositions in support of this motion for summary judgment.

[36]  Rayner 9/16/97 deposition page 191-192.

never videotaped McCarty.[37]   Nor did Rayner make any attempt to
videotape McCarty engaged in sexual activity.[38]

Unbeknownst to anyone but himself, Rayner engaged the services
of another Tallahassee private investigator, former defendant
Richard H. Matthews, to assist him in surveilling Mr. McCarty.

Rayner surveilled McCarty on only four occasions: portions of
the weekends of July 14, July 21, July 28, and August 4, although
on several other days he did spot check of plaintiff's house.[39]
Either on Monday, August 7, or Tuesday, August 8, Rayner gave a
verbal report to Blanton who told him, either on that day or within
the next couple of days, to discontinue the investigation and at
that point, Rayner knew the investigation was over.[40]  He then wrote
his report dated 12 August 1995, even though he knew the
investigation was over.[41]

There was nothing illegal or unusual regarding the
surveillance which Rayner performed; in fact, before beginning the

_____

[37]   Rayner's 9/16/97 deposition page 175 lines 5-7.

[38]   Rayner 9/16/97 deposition page 143.

[39]   Rayner's time records.  A copy is attached hereto as
exhibit B.   These records were contained as part of these
defendants' privileged document log attached to Bankers, Meehan,
and Delano's notice of in-camera filing of documents [Doc. #151].
Pursuant to the Unopposed Protective Order [Doc. #203] these
documents were produced to the parties.

[40]   Rayner 9/16/97 deposition page 182 lines 20 through page
185 line 12.

[41]   Rayner 9/16/97 deposition page 185.

11

surveillance, as a courtesy, he informed the Tallahassee Police Department of who he was and what he was doing.[42]

At no did Blanton ever ask Rayner to do anything that Rayner felt to be illegal.[43]  Blanton never told Rayner what to look for in his investigation or the method Rayner should use in conducting the investigation; he left that up to Rayner and Blanton was relying on Rayner's professionalism and experience in the business to make suggestions.[44]  Blanton never requested Rayner to wiretap anyone and Rayner never told Blanton that he had placed the wiretap.[45]  There was nothing in Rayner's verbal or written reports to Blanton which Rayner felt would lead Blanton to believe a wiretap had occurred.[46]  Rayner never told Blanton that any of the information Rayner was going to be seeking was not information that was a proper subject for gathering.[47]

### a.  The wiretap

On approximately Thursday, July 27, Mr. Rayner placed a wiretap on McCarty's home phone.[48]  However, he placed the wiretap

---

[42]  Rayner 4/25/97 deposition page 85.

[43]  Rayner 9/16/97 deposition page 214 lines 18-22.

[44]  Rayner 9/16/97 deposition page 195 line 22 through page 196 line 9.

[45]  Rayner 9/16/97 deposition page 192 line 25 through page 193 line 5.

[46]  Rayner 9/16/97 deposition page 193 line 6-16.

[47]  Rayner 9/16/97 deposition page 197 line 22 through page 198 line 1.

[48]  Rayner 9/16/97 deposition pages 167-169.

12

for reasons purely personal to himself and in no part activated by a purpose to serve Blanton, Blanton's client, or the investigation he had undertaken on behalf of Blanton and Blanton's client; in fact, in placing the wiretap, he was conducting his own "separate investigation".[49]

Rayner placed the wiretap because he had developed concerns that the fruit of his investigation might be used for blackmail or extortion.[50]  Unfortunately, Rayner did not voice his concerns to Blanton, even though he was not suspicious that Blanton might be part of an extortion or blackmail plot.[51]  Instead, he decided to conduct his own, separate investigation to determine whether there was any blackmail or extortion.[52]  Toward this end, Rayner wiretapped McCarty's home phone, reasoning that by listening to the conversations on McCarty's phone he might be able to confirm or refute whether there was extortion or blackmail.[53]

Rayner only listened to two, or perhaps three, phone conversations on McCarty's phone.[54]  None of these was after

---

[49]  Rayner 9/16/97 deposition page 177-178.

[50]  Rayner 9/16/97 deposition page 123 line 25 through page 130 line 22.

[51]  Rayner 9/16/97 deposition pages 127 line 11 through page 128 line 20.

[52]  Rayner 9/16/97 deposition page 178 line 3 through 10; page 129 line 25 through page 130 line 21.

[53]  Rayner 9/16/97 deposition page 129 line 25 through page 130 line 21.

[54]  Rayner 9/16/97 deposition page 206 lines 13-17.

13

August 7.[55]  Nothing he heard in these conversations was in any way damaging or embarrassing to the speakers in the conversations.[56]

The wiretap was discovered by the telephone employees on or about 22 August 1995.[57]  Before the wiretap was discovered, there is no way anyone other than Rayner could have known about it.[58] Rayner did not tell Blanton, or Richard Matthews (the private investigator whom Rayner hired to assist him in conducting the surveillance) or anyone else that he had placed the wiretap.[59]

### b.  Discovery of wiretap

As indicated above, on or about 22 August 1995 the wiretap was discovered by employees of the phone company.

One day in the end of September or the beginning of October of 1995 Rayner arrived home and found a card on his door from FBI agent Matt Chester.[60]  Attached to the card was a note asking Rayner to contact him.  Rayner thought that the visit from Chester was

---

[55]  Rayner 9/16/97 deposition page 208 line 24 through page 209 line 1.

[56]  Rayner 9/16/97 deposition page 210 line 12 through line 25.

[57]  Paragraph 1 of the **STATEMENT OF FACTS** which the prosecuting attorney filed at Rayner's 24 June 1996 first appearance and arraignment.  A copy is attached as part of exhibit A of plaintiff's complaint.

[58]  Rayner 9/16/97 deposition page 214 line 24 through page 215 line 7.

[59]  Paragraph 9 of the **STATEMENT OF FACTS** which the prosecuting attorney filed at Rayner's 24 June 1996 first appearance and arraignment, which is attached to plaintiff's complaint as part of Exhibit A.

[60]  Rayner 9/16/97 deposition page 224-225.

related to a case Rayner was working on with an attorney which had developed into a possible federal criminal matter. Acting under that impression, Rayner went to Chester's office at which time Chester told him that he was investigating the wiretapping of a Kevin McCarty and that there was a "bigger picture", that there was a large investigation of political corruption in the insurance industry.[61]  Mark Zaidra, with the Florida Department of Law Enforcement, was also present in Chester's office during that conversation.[62]

### c. Post discovery of wiretap matters

Mr. Rayner was issued a subpoena to appear on 11 October 1995 before the grand jury at the U.S. Courthouse in Tallahassee.[63]

On 13 October 1995 a story written by Lucy Morgan appeared in the *St. Petersburg Times* which stated that state and federal officials were investigating the wiretap found on McCarty's phone.

By Information dated 22 April 1996, the United States of America charged Rayner with knowingly and intentionally intercepting and endeavoring to intercept wire communications in violation of Title 18, United States Code section 2511(1)(a). (The Information is included as an exhibit to plaintiff's complaint.)

Pursuant to negotiations, Rayner reached an agreement to enter a plea of guilty to that charge. (Criminal Minutes - Arraignment

---

[61]  Rayner 4/25/97 deposition page 83 line 9 through page 84 line 8.

[62]  Rayner 4/25/97 deposition page 83 lines 5-7.

[63]  Rayner 9/16/97 deposition pages 224-225.

And Plea, a copy is attached to plaintiff's complaint as part of exhibit A.)

Rayner passed a polygraph given to him by the United States government confirming that Bankers had no knowledge that Rayner had placed the wiretap. (Page 15, line 8 through page 16, line 5 of the transcript of Rayner's first appearance and arraignment, attached hereto as Exhibit B.)

Paragraph 4 of the **STATEMENT OF FACTS** confirms that at all times material hereto, including while conducting the investigation of McCarty, Rayner was engaged in the distinct occupation of being a private investigator, licensed by the State of Florida.

In June of 1996 Messrs. Meehan and Delano arranged a meeting with Lucy Morgan, the reporter for the *St. Petersburg Times*. The purpose of this meeting was to discuss the flaws in the bid process by which insurance companies were selected to be servicing carriers for the Florida Residential Property Casualty Joint Underwriting Association. That meeting was held shortly before June 18. However, the bid process for the FRPCJUA did not appear to be Ms. Morgan's topic of interest. Rather, she was interested in McCarty and out of the blue asked if Bankers "wanted to dig up dirt and have [McCarty] fired."[64] That particular phrase made it into Ms. Morgan's article and then variations of that phrase made it into

---

[64]   Meehan deposition page 23 line 15 through page 24 line 4.

16

other articles, but that was not Banker's message or what Meehan or Delano had said.[65]

In order to document that neither Delano nor Bankers had any knowledge of or involvement with the wiretap, on 20 June 1996 Delano submitted to a polygraph administered by Harry R. Detwiler which confirmed (1) that Delano never directly contacted Rayner, (2) **that Delano did not authorize, know about or even suspect that a wiretap was in use in the McCarty investigation**, (3) that Delano was not withholding any information or reports received from Rayner, and (4) that Delano never engaged in any form of side billing in order to obtain wiretap information in the McCarty investigation.[66]

On 23 September 1996 the present lawsuit was initiated.

## II.   ENTRY OF SUMMARY JUDGMENT

The pleadings, depositions, answers to interrogatories and affidavits show that there is no genuine issue as to any material fact and that these defendants are entitled to entry of summary judgment as follows:

1.   In performing the investigation Rayner was an independent contractor, as a result, these defendants cannot be held liable for the acts and omissions of Rayner or Howard Investigations, Location & Discovery Services, and Richard H. Matthews, all of whom Rayner engaged to assist him in performing the investigation.

---

[65]   Meehan deposition page 24 lines 5-8.

[66]   Affidavit of Harry R. Detwiler.

17

2.    Even if Rayner were a servant (employee) and not an independent contractor, in placing the wiretap he was acting outside the scope of this authority.

3.    That this Court has no original/federal question jurisdiction over these defendants because these defendants cannot be held liable for Rayner's illegal act of placing a wiretap on plaintiff McCarty's phone.

4.    That under 28 U.S.C. § 1367 this Court does not have supplemental jurisdiction over the state law claims.

5.    That even if the Court does have supplemental jurisdiction over the state law claims, the state law claims should be dismissed pursuant to 28 U.S.C. § 1367(c) because the state law claims predominate over the sole alleged federal question.

6.    That these defendants did not tortiously interfere with plaintiff's employment relationship with the Department of Insurance.

7.    That these defendants did not conspire to tortiously interfere with plaintiff's employment relationship with the Department of Insurance.

8.    That these defendants did not slander the plaintiff.

9.    That these defendants did not conspire to slander the plaintiff.

10.    That these defendants cannot be held liable to plaintiff for intentional infliction of emotional distress.

11.    That these defendants cannot be found liable to plaintiff for invasion of privacy.

18

12.  That these defendants cannot be held liable to plaintiff for conspiracy to commit invasion of privacy.

13.  That Bankers did not hire Rayner to conduct an investigation of McCarty by **any available means, without regard to the legality of the means employed.**

14.  That Rayner did not make any representations to third parties which expressly and impliedly stated that plaintiff was involved in disreputable activities within his personal life.

15.  That these defendants did not make any representations which expressly or impliedly stated that plaintiff was involved in disreputable activities within his personal life and that he was involved in a purposeful mishandling of Bankers contract with the Florida Residential Property Casualty Joint Underwriting Association during 1995.

16.  That these defendants did not intentionally make false and misleading statements to third persons concerning information ostensibly discovered in the investigation.

17.  That the investigation performed by Mr. Rayner was not so outrageous in character and so extreme in degree as to go beyond all bounds of decency.

18.  That the information obtained by the investigation, even if it had been disclosed, was not highly offensive to a reasonable person.

19.  That these defendants did not make any representations regarding Mr. McCarty's private life which placed McCarty in a false light.

19

20.  That Bankers was not negligent in permitting Mr. Blanton to retain Mr. Rayner.

21.  That Bankers was not negligent in permitting Mr. Blanton to retain Rayner without providing safeguards to protect plaintiff from Rayner's unlawful activities.

22.  Defendants Delano and Meehan are entitled to entry of summary judgment pursuant to the corporate shield doctrine because at all times material to this action they were acting in their corporate capacities.

### MEMORANDUM OF LAW

### SECTION I

This Court does not have subject matter jurisdiction over Bankers, Meehan or Delano, contrary to the assertion at paragraph 2. of the complaint.[67]

#### A.  CHALLENGE TO SUBJECT MATTER JURISDICTION

Attacks on subject matter jurisdiction pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, come in two forms: **facial** attacks on the complaint "which require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction" taking the allegations as true and **factual** attacks "which challenge the existence of subject matter jurisdiction, in fact, irrespective of the pleadings." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).  When a party challenges the facts which are the foundation of subject matter

_____

[67] Defendants first affirmative defense raises lack of subject matter jurisdiction.

20

jurisdiction, the court need not and indeed, may not, presume the truthfulness of the complaint's factual allegations. **Id.; Holt v. United States,** 46 F.3d 1000, 1003 (10th Cir. 1995). Instead, the court may refer to affidavits and other documents and may conduct a limited evidentiary hearing to resolve disputed jurisdictional facts. **Holt**, 46 F.3d at 1003. The Eleventh Circuit, in **Lawrence**, stated:

> when the [subject matter jurisdiction] attack is factual, the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P.56. Because at issue . . . is the trial court's jurisdiction--its very power to hear the case- -there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

919 F.2d at 1529 (quoting **Mortensen v. First Fed. Sav. & Loan Ass'n.,** 549 F.2d 884, 891 (3d Cir. 1977)). And, it is plaintiff's burden to establish that this Court has proper subject matter jurisdiction and he must carry that burden with a preponderance of the evidence. **Reynolds v. Army and Air Force Exchange Serv.,** 846 F.2d 746, 748 (Fed. Cir. 1988); see also **Bradley v. United States Dept. of Commerce, Patent and Trademark Office,** 598 F. Supp. 38, 39 (N.D. Tex. 1984).

Now that McCarty's allegations are challenged, they alone are insufficient to meet his burden and he must put forth evidence demonstrating that his allegations are true and able to invoke this Court's jurisdiction. **Cedars-Sinai Med. Ctr. v. Watkins**, 11 F.3d

1573, 1584 (Fed. Cir. 1993).  However, McCarty cannot put forth such evidence.

The *Lawrence* court, citing others, set forth the standard by which a district court should decide factual attacks upon subject matter jurisdiction where, as here, the attack implicates an element of a cause of action.  McCarty's only federal question is whether the federal wiretap law (18 U.S.C. § 2520) was violated such that he is entitled to a civil remedy.

Although Rayner has admitted to placing the wiretap in violation of 18 U.S.C. § 2520, the uncontroverted evidence establishes that in performing the investigation Rayner was an independent contractor and that he placed the wiretap for reasons purely personal to himself and in no part activated by a purpose to serve Blanton, Blanton's insurance company client, or the investigation he had undertaken on their behalf; in fact, in placing the wiretap he was conducting his own separate investigation.  Thus, even if Rayner was not an independent contractor but a servant (employee), in placing the wiretap he would have been acting outside the scope of his authority. Therefore, since under no circumstances could there have existed an agency relationship between these defendants and Rayner with respect to the wiretap, these defendants cannot be liable to the plaintiff for Rayner's violation of 18 U.S.C. § 2520.

The question of agency is the underpinning of the federal question posed by McCarty and at the same time is the underpinning of this Court's jurisdiction.  Plaintiff does not bring his lawsuit

22

in federal court on any other basis, other than Rayner's violation of the federal wiretap law.

The law is clear that when a plaintiff's jurisdictional claim is intertwined with the merits of the plaintiff's claim:

> The proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case . . . . Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim . . . .

*Lawrence*, 919 F.2d at 1529 (quoting *Williamson v. Tucker*, 645 F.2d 404, 415-16 (5th Cir. 1981)).

Thus, this Court must find here that the jurisdictional challenge is "inextricably intertwined" with a challenge to the merits of the lawsuit, since a decision on one would effectively decide the other. Id. (citing *Eaton v. Dorchester Develop., Inc.*, 692 F.2d 727, 734 (11th Cir. 1982)).

In *Lawrence*, the existence of the plaintiff's cause of action was dependent upon whether a defendant was acting within the course and scope of his employment. Similarly, in the present case McCarty's cause of action is dependent upon whether in placing the wiretap defendant Rayner was a servant (employee) of Bankers, Meehan and Delano.

## 1. STANDARD FOR REVIEW OF SUMMARY JUDGMENT MOTION

As Rule 56 dictates, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the

23

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Of course, this Court must view the evidence in a light most favorable to the nonmovant, McCarty.  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 249-50 (1986).  But, it is not enough that plaintiff's evidence be "merely colorable" or anything short of significantly probative."  **Id.**

McCarty may not hint or imply that defendant Rayner was operating on behalf of Bankers, Meehan or Delano when he placed the wiretap.  He must present specific evidence of that fact, but he has not and cannot.  Indeed, the uncontroverted evidence is that he was not.

The cases which establish the nonmovant's burden to prove, once the burden has shifted from the movant, that an issue of material facts exists for the trier of fact are clear that the nonmoving party cannot rely on the pleadings to create a factual dispute, indeed, the party must "do more than simply show that there is some metaphysical doubt as to the material facts."  **Irby v. Bittick**, 44 F.3d 949, 953 (11th Cir. 1995).  A mere "scintilla" of evidence supporting the nonmovant's position will not suffice; there must be enough of a showing that the jury could reasonably find for the nonmovant.  **Walker v. Darby,** 911 F.2d 1573, 1577 (11th Cir. 1990) (citing **Anderson**, 477 U.S. at 242).

Bankers, Delano and Meehan have met their burden to "point out" that there is no genuine issue of material fact by submitting the affidavits, depositions and the documents referred to herein and referred to in these defendants' statement of facts as to which

24

they contend there is no genuine issue of material fact.  These materials demonstrate that defendant Rayner was an independent contractor and not a servant (employee) of Bankers, Meehan or Delano and that in placing the wiretap he was acting outside the scope of his authority.

### 2.   INDEPENDENT CONTRACTOR V. EMPLOYEE

The law of the state of Florida will control on the question of Rayner's relationship to Bankers, Meehan and Delano.  Some thirty years ago, the Florida Supreme Court approved the test set forth in the Restatement (Second) of Agency § 220 (1958) for determining whether one is a servant (employee) or an independent contractor.  Under Section 220, in determining whether one acting for another is a servant (employee) or an independent contractor, the ten (10) matters of fact enumerated in Section 220 are to be considered.  However, as will be more fully explained below, the courts can resolve as a matter of law the question of whether a person is an independent contractor or a servant (employee), **even though not every element of the Restatement factors supports the conclusion reached by the court.**

### PROCEDURE FOR DETERMINING IF INDEPENDENT CONTRACTOR

In *Keith v. News & Sun Sentinel Company*, 667 So.2d 167 (Fla. 1995), the Supreme Court set forth the procedure the courts should follow in determining whether a person is an independent contractor.  In *Keith* the court stated:

> Hence, courts should initially look to the agreement between the parties, if there is one, and honor that agreement, unless other provisions of the agreement, or

25

the parties' actual practice, demonstrate that it is not
a valid indicator of status.  In the event that there is
no express agreement and the intent of the parties cannot
be determined, courts must resort to a fact-specific
analysis under the Restatement based on the actual
practice of the parties.
                        * * *
We believe this analysis is consistent with the factors
set out in the Restatement.  We do not agree, however,
that the Restatement analysis may routinely be used to
support any resolution of the issue by the factfinder
simply because each side of the dispute has some factors
in its favor.  In *Kendall*[68] for example, **the Court noted
that not every element of the Restatement supported its
conclusion that the carrier was an independent
contractor, nevertheless, ... the court resolved the
issue as a matter of law.**

At S456 (footnote original; emphasis added).

Thus, in determining whether a person is an independent

contractor, the intent of the parties controls and the Restatement

factors are only resorted to if the intent of the parties cannot be

determined.  Moreover, if the intent of the parties cannot be

determined and the Restatement factors must be resorted to, **the**

**court can still decide the issue as a matter of law, even though** as

noted in *Keith*, **"not every element of the Restatement support[s]**

**its conclusion"**.[69] (Emphasis added).

_____

    [68]  **Miami Herald Publishing Co. v. Kendall**, 88 So. 2d 276 (Fla.
1956).

    [69]  Similarly, in **Wiseman v. Miami Rug Company**, 524 So. 2d 726,
729 (Fla. 4th DCA 1988), the court held that whether a person is an
independent contractor or an employee depends upon the
"existence... of a sufficient **group** of favorable factors to
establish the relation."  (emphasis added).  Thus, in order to
establish the relation, it is **not** necessary that each factor be
applicable in each case.  The relation can be established even
though some of the factors may not support the particular relation.
All that is required is a sufficient **group** of factors to establish
the relation.

### FACT SPECIFIC ANALYSIS UNDER THE RESTATEMENT

Before considering the Restatement factors, it is important to remember that, as noted in *Keith,* the courts can resolve as a **matter of law** the question of whether a person is an independent contractor or an employee, even though not **every** element of the Restatement supports the conclusion reached by the court.  **Id.** at S456.  In this respect, as noted in footnote 69, infra, **Wiseman** held that whether a person is an independent contractor or an employee depends upon the "existence... of a sufficient **group** of favorable factors to establish the relation".  (emphasis added). Thus, in order to establish the relation, it is **not** necessary that each factor be applicable in each case.  The relation can be established even though some of the factors may not support the particular relation.  All that is required is a sufficient **group** of factors to establish the relation.

Before separately discussing the Restatement factors as they apply to this particular case, it is helpful to consider *comment h* to §220 of the Restatement, which discusses the factors which indicate the relation of master and servant.  *Comment h* states:

> *h.   Factors indicating the relation of master and servant.*   The relation of master and servant is indicated by the following factors: an agreement for close supervision or *de facto* close supervision of the servant's work; work which does not require the services of one highly educated or skilled; the supplying of tools by the employer; payment by hour or month; employment over a considerable period of time with regular hours; full time employment by one employer; employment in a specific area or over a fixed route; the fact that the work is part of the regular business

27

of the employer; the fact that the community
regards those doing such work as servants; the
belief by the parties that there is a master
and servant relation; an agreement that the
work cannot be delegated.

### THE FACTORS

Set forth below are the Restatement factors to be used in
conducting the fact specific analysis referred to in *Keith*.
Following each factor will be a discussion of that factor, in light
of the facts of the present case.

(a) *The extent of control which, by the agreement, the master
may exercise over the details of the work.* As stated in *Kane
Furniture Corporation v. Miranda*, 506 So. 2d 1061 (Fla. 2d DCA
1987):

[T]he extent of control is the **most important** factor
in determining whether a person is an independent
contractor or an employee. The right of control as to
the mode of doing the work is the principal
consideration. If a person is subject to the control or
direction of another as to his results only, he is an
independent contractor; if he is subject to control as to
the means used to achieve the results, he is an employee.

At 1064 (emphasis added). (citations omitted).

As noted in *comment e*, "[t]he important distinction [between
an employee and an independent contractor] is between service in
which the actor's physical activities and his time are surrendered
to the control of the master. Those rendering service but
retaining control over the manner of doing are **not** servants".
(emphasis added).

In the present case, Rayner was not subject to the control or
the direction of Blanton or Bankers as to the details of the

28

investigation or the means by which Rayner conducted the investigation. Rayner was hired to obtain results. When hired, he did not even know the name of the insurance company which had hired Blanton. He was not directed as to the means used to achieve the results requested. In fact, neither Blanton, nor Bankers had any knowledge that Rayner had hired another private investigator, Richard Matthews, and were completely surprised that Rayner had done so. Rayner had total control over the means by which the investigation would be conducted. Furthermore, Rayner's physical activities and his time were not surrendered to the control of Blanton or Bankers. As noted in *comment e*, those rendering service but retaining control over the manner of doing their work are not servants.

(b) *Whether or not the one employed is engaged in a distinct occupation or business.*

Without question, at all times material hereto, Mr. Rayner was engaged in the distinct occupation of being a private investigator, and in this regard was self-employed. In fact, during the period of time he was investigating McCarty, he was also conducting investigations for other clients.

(c) *The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision.*

Investigators are skilled in their trade and typically perform the tasks associated with investigations without supervision. Indeed, "supervised investigator" is quite a contradictory term.

The very nature of the investigation occupation dictates that the investigator be free from supervision or observation.

(d) *The skill required in the particular occupation.* While unskilled labor is usually performed by those customarily regarded as servants, *comment i,* where the work is performed by a skilled person, it follows that the converse is true.

The investigation orchestrated by Mr. Rayner required a great deal of skill and was not a task which could be performed by unskilled labor.

(e) *Whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work.*

Mr. Rayner was not supplied with the place of work or with any other instrumentalities or tools.  Rayner furnished these himself - his transportation, Matthews, Howard Investigations, and Location & Discovery Services.

(f) *The length of time for which the person is employed.*  As stated in *comment j:*

> The time of employment and the method of payment are important.  If the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him. This is especially true if payment is to be made by the job and not by the hour.

In addition, as previously indicated, *comment h* teaches that "employment over a considerable period of time with regular hours" and "full time employment by one employer" are factors indicating

the relation of master and servant.  Naturally, it follows that the reverse is true.

Rayner worked on an as needed basis, in fact, working for Blanton and Bankers only once and for a short period of time.  He was not obligated to work exclusively for Blanton.

(g)  *The method of payment, whether by the time or by the job.* Comment *h* also instructs that another factor which indicates the relation of master and servant is payment by the hour or the month.

Defendant Rayner was paid specifically for his investigation of McCarty, he was not a salaried employee of Bankers, Meehan or Delano.

(h)  *Whether or not the work is a part of the regular business of the employer.*

Defendant Bankers is an insurance company and defendants Meehan and Delano are managers of the insurance company; the company was established to provide insurance to the consumers of the state, not to conduct investigations.  It was only in the rare circumstance (perceiving that as a regulator, McCarty was taking improper regulatory actions against defendant Bankers) that the movant defendants determined to retain defendant Rayner to conduct an investigation of plaintiff.

(i)  *Whether or not the parties believe they are creating the relation of master and servant.  Comment m* discusses this factor and states that "it is not determinative that the parties believe or disbelieve that the relation of master and servant exists, except insofar as such belief indicates an assumption of control by

31

the one and submission to control by the other. Conversely, if the belief indicates that the employer is **not** assuming control and that the one employed is **not** submitting to control by the employer, this would be "determinative" in establishing the relation of independent contractor.

Here, the parties believed that they were entering into an independent contractor relationship. Bankers did not withhold taxes from the payment made through the Tallahassee attorney for defendant Rayner's services. A person who is responsible for paying all taxes due has been found to be an independent contractor. *Id.* (citing *Lenox v. Sound Entert., Inc.*, 470 So. 2d 77, 78-79 (Fla. 2d DCA 1985)).

(j) *Whether or not the principle is or is not in business.*

The Kane Furniture court cited a statement by their former colleague, Justice Grimes, made in *D.O. Creasman Electronics v. Department of Labor and Employment Security*, 458 So. 2d 894, 898 (Fla. 2d DCA 1984), which statement is wholly applicable here: "[T]he relevance of this factor is obscure, but for what it is worth, [Bankers] is in business."

Measured against the Restatement criteria, this Court must find that defendant Rayner was an independent contractor. Because defendant Rayner was an independent contractor, rather than a servant (employee) of defendants Bankers, Meehan or Delano, the movants are not responsible for defendant Rayner's actions, no matter how distasteful to McCarty or illegal those actions were.

32

*McCall v. Alabama Bruno's, Inc.,* 647 So. 2d 175, 177 (Fla. 1st DCA 1994).

However, if this Court disagrees that defendant Rayner was an independent contractor and determines that he was somehow a servant (employee) of Bankers, Meehan or Delano, then the Court must conclude that any illegal acts committed by defendant Rayner or at his behest were outside the scope of the authority provided him by defendants Bankers, Meehan or Delano.

Florida law is absolute that an employer/principle cannot be held vicariously liable for actions of a servant (employee) when those actions are beyond the course of scope of the employment. *Liberty Mutual Ins. Co. v. Electronic Sys., Inc.,* 813 F. Supp. 802, 805 (S.D. Fla. 1993); *Manrique v. Bob's Plumbing Co.,* 573 So. 2d 422, 423 (Fla. 3d DCA 1991); *Kane Furniture,* 506 So. 2d at 1067.

An agent is acting within the scope and authority of his agency **only** if the act:

(i) is the kind the employee is hired to perform, (ii) occurs substantially within the time and space limits authorized or required by the work to be performed, **and (iii) is activated at least in party by a purpose to serve the employer.** *Spencer v. Assurance Co. of America,* 39 F.3d 1146, 1149 (11th Cir. 1994); *Hennagan v. Dept. of Highway Safety and Motor Vehicles,* 467 So. 2d 748, 750 (Fla. 1st DCA 1985). **Unless all three of the factors are present, an employee is beyond the scope of his employment.**

An employee is not acting in the scope of employment if it can be found that he has "stepped away" from the employer's business

and that the motive for the act was unrelated to the employee's duties, but rather was in furtherance of the employee's interests. *Gibbs v. Air Canada*, 810 F.2d 1529, 1532 (11th Cir. 1987) (employer is not liable in tort for actions taken in furtherance of employee's own interests rather than the employer's interests); *Hennagan*, 467 So. 2d at 750.

Within this case, defendant Rayner, in placing the wiretap, was not within the scope of agency established by Blanton on behalf of Bankers, Meehan and Delano.  His actions fail two of the three parts of the "scope of authority" test: (i) the placing of an illegal wiretap was not the kind of act defendant Rayner was hired to perform--he was hired to perform a legal investigation and (iii) his actions were motivated not by a purpose to serve Bankers, Meehan or Delano but to serve his own interests.

This Court should conclude that defendant Rayner was an independent contractor based upon the evidence presented with this motion or at the very least must determine that if he was a servant (employee) of the movants, then defendant Rayner was operating outside of the scope of his authority when he placed the wiretap and when he engaged in what McCarty refers to as negligent investigation techniques.

Likewise, if any of the actions of either Howard Investigations or Discovery & Location Services were illegal or otherwise inappropriate, these actions would have been outside the scope of authority given by defendants Bankers, Meehan, and Delano. Either way, because the evidence is and will remain uncontradicted

that defendant Rayner was not acting on behalf of Bankers, Meehan or Delano when he placed the wiretap which gives rise to McCarty's causes of action against defendants Rayner, Bankers, Meehan and Delano, McCarty has not invoked the subject matter jurisdiction of this Court with regard to Bankers, Meehan or Delano.  McCarty's failure to invoke the subject matter jurisdiction, because it is inextricably intertwined with the merits of his federal claim, must result in entry of summary judgment in favor of the movants and dismissed for lack of jurisdiction.

**SECTION II**

Whether or not this Court dismisses or enters summary judgment as to Counts II, IV, V, and VI (the federal wiretap claims against Bankers, Delano and Meehan) for lack of original or federal question jurisdiction, this Court should dismiss or enter summary judgment on each of the state law claims in the plaintiff's complaint as this Court lacks subject matter jurisdiction.

Pursuant to 28 U.S.C. § 1367(a) this Court does not have proper supplemental jurisdiction over the state claims because those claims do not form part of the same case and controversy giving rise to the alleged federal question subject matter jurisdiction and because the state law claims clearly predominate over the singular federal claim.

**A.  APPLICATION OF 28 U.S.C. § 1367 SUPPLEMENTAL JURISDICTION**

McCarty's state law claims against Bankers, Meehan and Delano are tortious interference with employment relationship, slander, intentional infliction of emotional distress, invasion of privacy,

35

negligence, and violation of section 934.10, Florida Statutes, which is virtually identical to the federal wiretap statute sued on in Counts I through VI.

As reviewed above in section I, the sole federal claim before this Court is a violation of 18 U.S.C. § 2520, the federal wiretap statute. Even at first glance, it is evident that the facts which would give rise to a claim under the federal wiretap law would not be the same facts which would give rise to plaintiff's state law claims, except the claims under section 934.10, Florida Statutes, the state wiretap statute.

In order for a Court to determine the appropriateness of asserting jurisdiction over state law claims, it must look to 28 U.S.C. § 1367(a) supplemental jurisdiction. Case law preceding the codification of section 1367 in 1990, strongly suggested that the longstanding concepts of ancillary and pendent jurisdiction were in fact coalescing into a single doctrine.

Congress confirmed this by adopting a single term - "supplemental jurisdiction" - to describe the power that district courts possess to hear state law claims. The Judicial Improvement Act of 1990, now codified as section 1367 states in part:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall involve the joinder or intervention of additional parties.

36

In codifying the concept of "supplemental jurisdiction," Congress stated that the district courts shall only have supplemental jurisdiction over those claims "that are so related to claims in the action within such original jurisdiction that **they form part of the same case or controversy.**" § 1367(a) (emphasis added); see also *Palmer v. Hospital Auth. of Randolph Co.*, 22 F.3d 1559 (11th Cir. 1994) (citing § 1367(a) to support its analysis of supplemental jurisdiction over state law claims).

Accordingly, in the present case, this Court must determine jurisdiction to hear the state claims pursuant to section 1367, not under the doctrine of "pendent jurisdiction" as pled in paragraph 3 of McCarty's complaint.

In the event that this Court determines that the state law claims form part of the same case or controversy to meet the constitutional requirements for subject matter jurisdiction under section 1367(a), this Court may still decline supplemental jurisdiction relying on the four exceptions found in section 1367(c).

The application of pertinent Eleventh Circuit case law interpreting section 1367 establishes that McCarty's various state law claims not only fail to meet the minimum constitutional requirements for supplemental jurisdiction under section 1367(a), but also that the state law claims substantially predominate over the singular claim over which this Court has original jurisdiction.

## 1. SECTION 1367(a): SAME CASE OR CONTROVERSY

In deciding whether a state law claim is part of the same case or controversy as a federal issue, the court must look at whether the claims arise from the same facts, involve similar occurrences, witnesses or evidence. *Palmer*, 22 F.3d at 1566.

In the present matter, except for the claims based on the violation of section 934.10, Florida Statutes, the allegations supporting the state law claims do not arise from the same facts and do not involve occurrences and evidence which are similar to the occurrences and evidence giving rise to the federal claim. *Palmer* is illustrative on this point.

In *Palmer*, both the federal law and state law claims arose from the same two occasions when a patient presented herself to a physician and a hospital and allegedly received either mistreatment or no treatment. Original jurisdiction was based on a COBRA claim against two defendants, the physician (defendant Bates) and the hospital (defendant Patterson). The state law claims were based on the Georgia Wrongful Death Act (Ga. Code Ann. § 51-4-1), the Georgia Medical Malpractice Act (Ga. Code Ann. § 51-1-27), the Georgia Hospital Care for Pregnant Women Act (Ga. Code Ann. § 31-8-40), and lastly Georgia common law. In holding that the district court could exercise supplemental jurisdiction over the state claims pursuant to section 1367(a), the court pronounced:

The Georgia plaintiffs' state law claims against Patterson and Bates are certainly part of the same case or controversy as the COBRA claims. The Georgia plaintiffs' state law claims all arise

38

from the same two events as the COBRA claims.  They will involve the same witnesses, presentation of the same evidence, and determination of the same, or very similar, facts.

Unlike the present matter, the *Palmer* court was faced with both federal and state law claims based upon the same occurrence, that being--two occasions of mistreatment or no treatment at a hospital.

On the other hand, in the case sub judice, with respect to the state law claims not based on section 934.10, Florida Statutes, several different occurrences support the state law claims, none of which is the same occurrence which gives rise to the federal claim. The sole federal claim before this Court alleges a wiretap in violation of 28 U.S.C. § 2520.

The state law claim of invasion of privacy alleges publication of private facts to a newspaper and to Florida state investigators by Bankers, Meehan and Delano -- obviously not the same occurrence as a wiretap on McCarty's telephone.

Second, the state law claim of tortious interference with employment relationship alleges that Bankers, Meehan and Delano, intentionally and maliciously interfered with McCarty's relationship with his employer -- once again, not the same occurrence as a wiretap on McCarty's telephone.

Furthermore, the state law claim of slander alleges that Bankers, Meehan and Delano spoke defamatory words to a newspaper about McCarty's personal life -- not the same occurrence as an alleged wiretap on McCarty's telephone.

39

The plaintiff also alleges a cause of action of intentional infliction of emotional distress.  Here McCarty alleges that the hiring of a private investigator to uncover personal facts and the publication of statements which impliedly represented that McCarty was involved in disreputable activities rises to the level of outrageous conduct.  These alleged occurrences are not the same occurrence as the placing of a wiretap on McCarty's telephone.

Likewise, plaintiff's state law negligence claims against Bankers, Delano and Meehan involve alleged occurrences which are not the same occurrence as the placing of a wiretap on McCarty's telephone.

It is indisputable that since the sole occurrence giving rise to the federal claim is completely different than the alleged occurrences which give rise to the numerous state law claims (except the claims based on section 934.10, Florida Statutes) that different witnesses and different presentations of evidence will be necessary to support the state law claims.

For example, to support the federal wiretap cause of action against defendant Rayner **plaintiff will not need to call any witnesses.**  This is so because in his answer to the complaint and in his deposition Rayner has admitted placing the wiretap.  Yet, to support the tortious interference with an employment relationship cause of action, McCarty would have to call his employers, perhaps co-workers, but clearly not defendant Rayner or federal investigators.  Furthermore, to support the slander cause of action, McCarty would be compelled to call witnesses from the *St.*

40

*Petersburg Times,* and certainly would not need to call defendant Rayner or the federal investigators.  The same would be true for the other state law claims.  As such, pursuant to the *Palmer* analysis, McCarty's various state law claims fail to meet the minimum constitutional requirements for supplemental jurisdiction under section 1367(a).

Recently, in *Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451 (11th Cir. 1996), the court utilized the *Palmer* analysis in holding that the district court did not have the power to assert supplemental jurisdiction over various state law claims.  In *Hudson,* the plaintiffs commenced an action against Delta and various Delta officials based upon alleged violations of the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. ("ERISA"), and also asserting a state law breach of contract cause of action.  The ERISA causes of action were based upon allegations that Delta had announced changes in the medical insurance benefits plan provided by the company to its employees and retirees.  The complaint also alleged a state law breach of contract predicated upon allegations that Delta made promises to the plaintiffs regarding certain flying privileges throughout their retirement.  The District Court dismissed the state law claim as it did not arise from the same case or controversy as the ERISA cause of action.

The Eleventh Circuit affirmed the district court's dismissal of the state law claims relying on the principles espoused in *Palmer.*  The court opined:

The court's power to adjudicate Count V (the state law claim) therefore turns on whether the state law cause of action alleged therein is so related to an ERISA ground that they form part of the same case or controversy.  In deciding whether a state law claim is part of the same case or controversy as a federal issue, we look to whether the claims arise from the same facts, or involve similar occurrences, witnesses or evidence.  **Id.** at 455.

The court recognized that the only factor that the ERISA claim and the state law claim shared was that the airline's decisions with respect to ERISA benefits and flight benefits affected retired employees.  As such, this common factor alone was not enough to provide a "sufficient nexus" between the federal and state cause of action to support supplemental jurisdiction.  **Id.** at 456.

Here, as in ***Hudson***, the sole federal claim and the numerous state law claims (except those based on section 934.10, Florida Statutes) do not arise from the same facts and do not involve similar occurrences, witnesses or evidence.  As outlined above, McCarty's allegations supporting the various state common law claims are entirely different occurrences from the federal wiretap claim.  The facts to be developed, and the presentation of witnesses and evidence would clearly be different than the evidence necessary to support the sole federal claim.  As there was no "sufficient nexus" in ***Hudson***, there certainly is no sufficient nexus here to warrant this Court to assert supplemental jurisdiction over the numerous state law claims which have no factual connection to the wiretap claim whatsoever.

42

## 2.  SECTION 1367(c): DISCRETION NOT TO EXERCISE JURISDICTION

However, even if this Court determines that the various state law claims do in fact arise from the same case and controversy as the federal claim, it may still dismiss the state law claims pursuant to 28 U.S.C. § 1367(c).

Prior to the enactment of the Judicial Improvement Act of 1990, courts were turning to the longstanding principles enunciated in *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), to determine the appropriateness of asserting "pendent jurisdiction." Gibbs divided the analysis into two distinct sections. First, the power of the federal court to exercise pendent claim jurisdiction, as seen today in 28 U.S.C. § 1367(a), discussed above. And second, establishing the federal court's discretion not to assert "pendent jurisdiction" despite having the power to do so. **Id.** at 725-26.

Today, the discretionary power of the federal courts not to exercise supplemental jurisdiction is codified in 28 U.S.C. § 1367(c), which states:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if --
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

In interpreting section 1367(c) the courts have held that where state law torts encompass legal duties and standards which

are wholly unrelated to the federal claims, and the state claims would dominate over the federal issues, a federal court should not exercise supplemental jurisdiction. See generally *Winn v. North American Philips Corp.*, 826 F. Supp. 1424 (S.D. Fla. 1993). The *Winn* decision is supportive of the discretionary power of the court to decline the exercise of supplemental jurisdiction and is on point in this case

In *Winn*, the plaintiff alleged that she was sexually harassed, not given equal pay, and then fired because of her age. She stated causes of action under the Civil Rights Act of 1991, Title VII, the Equal Pay Act, and the ADEA. She also pled seven state law claims for negligent hiring, negligent supervision, negligent retention, negligent misrepresentation, promissory estoppel, intentional infliction of emotional distress, and tortious sexual harassment. *Id.* at 1425. The district court, sua sponte, dismissed the state law claims pursuant to 28 U.S.C § 1367(c). The court intimated that perhaps the state law claims could be dismissed pursuant to section 1367(a) because all of the claims "did not arise out of a common nucleus of facts." *Id.* at 1425.

The court instead relied upon section 1367(c)(1)(2) for the dismissal because the state claims presented both novel and complex questions of state law which would also predominate over the federal claims present in the case. The court opined:

> The above claims require completely different elements of proof than the federal claims. These claims would tend to dominate this case and to obscure the importance of the underlying discrimination claims.

44

Accordingly, in this McCarty case, because the state law claims are novel and complex, and because they would undoubtedly predominate over the federal wiretap claim, this Court should dismiss the state law claims.

## SECTION III

### A.  ENTRY OF SUMMARY JUDGMENT ON STATE LAW CLAIMS

If this Court permits McCarty's state law claims to proceed in this Court notwithstanding the improper subject matter jurisdiction invoked by Counts II, IV, V and VI and notwithstanding the provisions of 28 U.S.C. § 1367(a)(b), and (c), the Court should, nonetheless, enter summary judgment on the state law claims as follows:

All of plaintiff's state law claims, except for the violation of the state wiretap statute, are based upon plaintiff's allegation that the investigation obtained "private information" on McCarty. Complaint paragraph 25.  However, when McCarty's deposition is read in context with the information actually obtained by the investigation (and, more importantly the information **not** obtained by the investigation) it is evident that no significant private information was obtained.

In this regard, in his deposition McCarty was specifically asked to identify the private information that was obtained by the investigation.  He listed the following: information about his checking account, information on the long distance telephone calls he made, information about who came and went at his house, information about what bars he frequented, information about who he

45

allegedly slept with, and information obtained through the wiretap and videos.  McCarty deposition page 139 line 8 through page 145 line 13.

However, as indicated above, McCarty's testimony must be read in context with what the uncontroverted evidence establishes was and was not obtained by the investigation.  When this is done it is evident that the investigation did not obtain information about who McCarty slept with.  Rather, the investigation merely revealed, who went into Mr. McCarty's house.  Similarly, Rayner's testimony establishes that nothing was revealed by his wiretap.  Rayner's testimony also establishes that he did not videotape McCarty.

As will be more fully explained below, since the investigation did not result in the obtaining of private facts, summary judgment should be entered on the state law claims discussed below.

### 1.  SLANDER

Counts XVIII, XIX, and XX are plaintiff's purported claims for slander.  These counts are based upon the allegation that Meehan and Delano "spoke defamatory words to the *St. Petersburg Times* which were ultimately published to third parties" . . . "which expressly and impliedly stated that Mr. McCarty not only was involved in disreputable activities within his personal life, but also was involved in a purposeful mishandling of Bankers' contract with the Florida Residential Property Casualty Joint Underwriting Association during 1995."  (Complaint paragraphs 187, 188, 193, 194, 199, and 200).

46

McCarty attached to his complaint as exhibit B a copy of an 18 June 1996 article written by Lucy Morgan which appeared in the *St. Petersburg Times*. McCarty alleges in paragraph 40 of the complaint that "[a]s referenced in the *St. Petersburg Times* article, the defendant, Bankers, through its managing agents or officers, the defendants, Messrs. Meehan and Delano, published the private facts obtained by the defendants, Messrs. Rayner and Matthews, to third parties, including but not limited to state investigators.

Despite these allegations, McCarty's deposition testimony and the *St. Petersburg Times* article establish that Messrs. Meehan and Delano did not say anything regarding Mr. McCarty which would constitute actionable slander. In this regard, in his deposition Mr. McCarty was specifically asked, with reference to paragraph 187 of the complaint, what defamatory words he contended Meehan and Delano spoke to the *St. Petersburg Times* which were ultimately published to third parties. He responded: "I was involved in illegal activities, that implied in there was (sic) that they already had information, but they wanted to dig up unsavory information or dig up dirt. And they referred to me as a hatchetman (sic)." McCarty deposition page 171 line 1 through page 173 line 2.

Similarly with respect to the allegations contained in paragraph 188 of the complaint that Bankers made representations to the *St. Petersburg Times* which expressly and impliedly stated that McCarty was involved in disreputable activities within his personal life and was involved in a purposeful handling of Bankers' contract

47

with the Florida Residential Casualty Property Joint Underwriting Association during 1995, in describing these representations McCarty testified: "Nelson was repeated (sic) to be a bit of a boy scout; we thought that if McCarty was doing anything unsavory, maybe Nelson would see the light." "References to Bax building an empire on his own and that I still had a close relationship with Bax. Referring to me as the JUA hatchetman (sic). That Bax was scaring me." McCarty deposition page 173 line 3 through page 176 line 9.

Since McCarty's deposition establishes that these are the only defamatory words which he contends Meehan and Delano spoke to the *St. Petersburg Times,* summary judgment should be entered on the slander counts.

### 2.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In bringing his intentional infliction of emotional distress claims (Counts XXIII, XXIV, and XXV), McCarty relies upon the same allegation that "Bankers' published statements which expressly and impliedly represented that Mr. McCarty was involved in disreputable activities within his personal life and that Mr. McCarty was involved in a purposeful mishandling of the defendant, Bankers' contract with the Florida Residential Casualty Property Joint Underwriting Association in 1995." As indicated above, in his deposition Mr. McCarty described the statements which he contends Bankers published which expressly and impliedly represented that he was involved in disreputable activities within his personal life and that he was involved in a purposeful mishandling of the FRPCJUA

48

contract.  However, since those statements will not support a claim for slander, those statements will not support a claim for intentional infliction of emotional distress.

Summary judgment should also be entered on the intentional infliction of emotional distress claims because despite all the pleadings, this is a simple case.  Because Bankers wanted to determine McCarty's motivation for his disregard of the law and frequent abuse of his authority, Bankers engaged Ed Blanton to hire a private investigator to investigate Mr. McCarty.  That investigation consisted of a search of public records, a search of computer databases, investigation into McCarty's finances, and surveillance of Mr. McCarty in public places.  Although Rayner placed the wiretap, as discussed above, that was not part of the investigation he performed for Blanton and Bankers.

After the wiretap was discovered, Messrs. Meehan and Delano answered questions regarding the investigation posed by members of the press.

In *Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277 (Fla. 1985), the Florida Supreme Court approved the Fourth District Court of Appeal's opinion in *Metropolitan Life Insurance Co. v. McCarson*, 429 So.2d 1287 (Fla. 4th DCA 1983), which had adopted section 46 of the Restatement (Second) of Torts as the appropriate definition of the tort of intentional infliction of emotional distress.  In doing so, the Supreme Court specifically noted that actions for intentional infliction of emotional distress must

49

conform to the explanation of the definition contained in *Comment d.* of that section, which states:

> *d. extreme and outrageous conduct* . . . . It has not been enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been **so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.** Generally, the case is one which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

(emphasis added).

It is the trial court's responsibility "to determine in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Paul v. Humana Medical Plan, Inc.*, 682 So.2d 1119, 1122 (Fla. 4th DCA 1996), citations omitted.

Summary judgment should be entered on the intentional infliction of emotional distress claims contained in Counts XXIII, XXIV, XXV and XXVI because the conduct of Bankers, Delano and Meehan was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

This is so because neither checking public records, nor conducting computer database searches, nor obtaining the financial information and phone information which was obtained, nor

50

surveilling someone in public places is the type of conduct defined in *Comment d*.

In fact, the investigation of government employees and officials is common place. For example, for a period of four years, from 1989 until 1993, the Florida Cable Television Association conducted a secret investigation to gather information about the way the Public Service Commission (PSC) did business, because the cable television association was concerned that the PSC's decisions were not being made in an objective fashion. The cable television association hired a private investigator and a former newspaper reporter to assist in the investigation. Between $20,000 and $25,000 was paid to the private investigator. During the course of the investigation long distance toll information was obtained regarding at least one member of the PSC. The investigation also included collecting public documents and conducting surveillance of the PSC parking lot. (See 29 September 1993 and 30 September 1993 articles appearing in the *St. Petersburg Times* authored by Lucy Morgan and Elizabeth Willson. These defendants have filed a request asking the Court to take judicial notice of various matters, including these two articles. That motion has not yet been assigned a docket number).

Another example is the 1992 investigation Paul Pinkham and Paul Van Osdol, reporters for the *Florida Times-Union*, conducted of county and circuit court judges in Jacksonville. This investigation consisted of surveilling the judges for approximately three weeks. During the investigation detailed records were kept

of the times the judges entered and left the courthouse, where they went and what they did.

Not only did the investigation involve surveillance, but it also involved taking pictures of the judges.  One of the pictures was of a judge working on one of his boats during the middle of the afternoon.  Another picture was obtained by the reporters after following a judge from the courthouse to the YMCA, where at 11:50 a.m. he was photographed jogging.  (See articles which appeared in the 14 June 1992 *Florida Times-Union*.  Defendants' motion for the Court to take judicial notice also includes these articles).

Furthermore, the depositions of Delano and Meehan establish that, contrary to the allegations contained in Counts XXIII, XXIV, and XXV, they did not publish statements which expressly and impliedly represented that Mr. McCarty was involved in disreputable activities within his personal life and that he was involved in a purposeful mishandling of Bankers contract with the FRPCJUA in 1995 and that they did not hire a private investigator to conduct a covert investigation of Mr. McCarty by any available means, without regard to the legality of the means employed and that they did not intentionally make false and misleading statements concerning Mr. McCarty.

### 3.   TORTIOUS INTERFERENCE WITH AN EMPLOYMENT RELATIONSHIP

Counts XIII, XIV, and XV are claims that Bankers, Meehan and Delano tortiously interfered with McCarty's employment relationship with his employer, the Florida Department of Insurance (DOI).  In order to prevail on this claim plaintiff must pled and **prove** (1)

that an employment relationship existed; (2) that defendants knew of the relationship; (3) that defendants intentionally and unjustifiedly **interfered** with that relationship; and (4) that McCarty was damaged as a result of the interference. ***Ethan Allen, Inc. v. Georgetown Manor, Inc.,*** 647 So. 2d 812, 814 (Fla. 1994); ***Tamiami Trail Tours, Inc. v. Cotton,*** 463 So. 2d 1126, 1127 (Fla. 1985).

McCarty has not even pled the third element - that Bankers, Meehan and Delano intentionally and unjustifiedly interfered with plaintiff's employment relationship. And, the uncontroverted evidence establishes that McCarty cannot prove this element. In hopes of sufficient pleading, McCarty's paragraphs 150, 156, and 162 allege that defendants Bankers, Meehan, and Delano "intentionally and maliciously interfered with Mr. McCarty's relationship with the Florida Department of Insurance by hiring the defendants Messrs. Rayner and Matthews, to conduct a covert investigation with the intended purpose to have Mr. McCarty terminated from his employment with the Florida Department of Insurance. Boiled down from the legalese, what McCarty pleads is that the defendants were maybe going to try and interfere with his employment relationship.

Summary judgment should be entered on the claims for interference with employment relationship because all of the evidence establishes that **these defendants did absolutely nothing with the information revealed by Rayner's investigation**, other than (1) comply with Florida Department of Law Enforcement (FDLE) agent

53

Mark Zaidra's request that the FDLE be provided with a copy of Bankers' file on the McCarty investigation and (2) respond to questions posed by members of the press.  There is absolutely no evidence that these defendants used the information revealed by Rayner's investigation to interfere with McCarty's employment relationship.  Specifically, when the investigation did not yield a motive for McCarty's actions, the investigation was terminated in the first week of August.  Thereafter, although the wiretap was discovered on August 22 and although on 13 October 1995, Lucy Morgan with the *St. Petersburg Times* wrote an article stating that state and federal officials were investigating the wiretap found on McCarty's phone, these defendants did nothing further in this matter until the late fall of 1995 when Delano received a call from FDLE agent Zaidra, at which time Zaidra inquired as to whether Bankers had had McCarty investigated.  Delano replied that Bankers had.  Thereafter, in January of 1996, Mr. Delano complied with agent Zaidra's request that the FDLE be given a copy of Bankers' file on the McCarty investigation.  However, other than that conversation with Zaidra and complying with Zaidra's request for a copy of McCarty's file, **at no time did these defendants ever provide to anyone any portion of the file and at no time did these defendants ever communicate to anyone any of the information revealed by the investigation.**

Succinctly stated, these defendants did not do anything which could be construed as intended to intentionally and maliciously interfere with McCarty's employment relationship with the

54

Department of Insurance.    And, it is significant to note that McCarty continues to be employed by the Department of Insurance.

## 4. INVASION OF PRIVACY

Florida recognizes several theories of recovery under a common law invasion of privacy claim, including the publication of private facts and placing facts in a false light. ***Cape Publications v. Hitchner***, 549 So. 2d 1374 (Fla. 1989).   Florida has adopted the Restatement's test of invasion of privacy based on publication of private facts.   **Id.**   For McCarty to prevail on his invasion of privacy claims against these defendants, he must plead and prove four elements: (1) private facts were disclosed; (2) the disclosure was public; (3) the matter publicized was highly offensive to a reasonable person; and (4) the matter is not a legitimate concern to the public.   Restatement (Second) of Torts § 652D (1977).   The tort of invasion of privacy for placing facts in a false light simply adds an additional "false light" element. ***Byrd v. Hustler Mag., Inc.***, 433 So. 2d 593 (Fla. 4th DCA 1983).

In considering the invasion of privacy claims, it is necessary to analyze the information obtained by Rayner's investigation. This information falls into the following four categories:

1. What Rayner (and in some instances Matthews) saw while surveilling Mr. McCarty.   It must be remembered that this surveillance was **only** conducted in **public** places as follows: the front of McCarty's house; the front of his office; entering a Winn-Dixie; entering the New China Restaurant; Brothers Bar and Lounge; he front of the homes of two people with whom McCarty was seen;

55

entering a Jiffy Food Store; entering a barber shop; entering a post office; entering the Larsen Building; entering Gold's Athletic Club West; the Tallahassee Airport; entering East Side Mario's Restaurant; and  entering a home in the Lake Talquin State Recreation Area.

2. A search of public records.

3. Computer database searches.

4. A financial report which revealed the balance of McCarty's checking account as of 5/4/95, deposits into the checking account from 1/4/95 through 5/4/95, monthly drafts from the checking account for a mortgage payment and a credit card, the balance of his savings account as of 5/4/95, deposits into the savings account from 1/31/95 through 4/27/95, the amount of his car loan, and the amount of the monthly car payment.  It also revealed that there was no evidence of ownership of stocks, bonds, mutual funds, warrants, or annuities and listed five long distance telephone numbers dialled from McCarty's residence in April and May of 1995.

In light of the elements of a claim for invasion of privacy discussed above, and in light of the allegations contained in the invasion privacy counts that these defendants published representations of the private facts obtained from the private investigator to the *St. Petersburg Times* and to Florida state investigators, the issues on the invasion of privacy claims are (1) whether these defendants disclosed **private** facts, (2) and, if so, whether the disclosure was public, and (3), if so, whether the matter disclosed was highly offensive to a reasonable person.

56

Summary judgment should be entered in favor of these defendants on the invasion of privacy claims because the uncontroverted evidence is that neither Delano nor Meehan published representations of the private facts obtained from the investigation to the *St. Petersburg Times* or to anyone else, except that Bankers did comply with the request from FDLE agent Zaidra to provide the FDLE with a copy of Bankers' file on the investigation.

Furthermore, summary judgment should be entered on these claims for the reasons set forth below:

1. With the possible exception of the financial information, none of the information obtained by the investigation was of private facts. However, even if **all** of that information was of private facts and even if these defendants had publicly disclosed those facts, actionable invasion of privacy would not exist because none of those facts would have been "highly offensive to a reasonable person".

2. Obviously, merely watching a person in public places is not invasion of privacy. *Pemberton v. Bethlehem Steel Corporation*, A.2d 1101, 1116 (MD. App. 1986) (surveillance, if conducted in a reasonable and non-obtrusive, manner does not constitute invasion of privacy; surveillance consisting of observing plaintiff from outside his residence, outside what appeared to be his girlfriend's home, outside a shopping center and a convenience store, and along public roads does not constitute invasion of privacy).

3.   It is equally obvious that the search of public records will not support a claim for invasion of privacy, nor will searching public computer databases.

4.   Obtaining the long distance telephone numbers called from Mr. McCarty's house during the months of April and May of 1995 was not the obtaining of private information, as confirmed by the Florida Public Service Commission order PSC-94-09695-FOF-TP, which involved the PSC's investigation into the dissemination of long distance telephone and other customer records and related customer privacy issues.  That order concluded that "there is no provision either (sic) state or federal law that precludes dissemination of customer specific information".  The legislature responded to that finding by amending section 364.24, Florida Statutes, to prohibit any officer or person in the employ of a telecommunications company from intentionally disclosing customer account records.  This amendment was not effective until July of 1995, which was **after** the information on McCarty's long distance phone calls was obtained. It is also significant to note that the amendment to section 364.24 only prohibited the officers and employees of telecommunications companies from disseminating the information.

5.   As noted above, even if the financial information which was obtained on McCarty was private information, and even if Delano and Meehan had disclosed that information (the evidence before the Court is that it was not disclosed), the disclosure of that information would not have been "highly offensive to a reasonable person".

Furthermore, Delano and Meehan answering questions posed by the media regarding McCarty, the Department of Insurance, and the Joint Underwriting Associations cannot constitute invasion of privacy because all of the information published by the newspapers was of a legitimate public interest. *Cape Publications, Inc. v. Hitchner*, 549 So.2d 1374, 1377 (Fla.), appeal dismissed, 493 U.S. 929 (1989).

Certainly, comments regarding a public employee's competency is a matter of legitimate public concern. *Wineland County Commissioners of Dorchester County*, 892 F. Supp. 719, 723(D) (Md. 1995), which cited the Restatement (Second) of Torts § 652(d). In that case, after a public hearing regarding his qualifications, the director of recreation and parks for a county in Maryland was fired. He sued for, among other things, invasion of privacy but the District Court entered summary judgment in favor of the defendant, noting that the issue of plaintiff's incompetency as a government employee was a matter of legitimate public concern.

An additional ground for entry of summary judgment on McCarty's claim for invasion of privacy is that even under the Federal Rules' liberal pleading requirements, the complaint fails to state a cause of action for invasion of privacy. Of course, the invasion of privacy counts "must contain . . . direct allegations on every material point necessary to sustain a recovery on any legal theory . . . ." *City of Gainesville v. Florida Power & Light Co.*, 488 F. Supp. 1258, 1263 (S.D. Fla. 1980) (quoting Professors Wright and Miller). That is, such deference to the statements of

the complaint must not extend to completely conclusory statements which fail to give adequate notice to the opposing party or the court of the claim and the grounds upon which it rests. **Id.** at 1264. Liberal pleading still requires that a complaint "must comprehend a so-called prima facie case . . . and enough data must be pleaded so that each element of the alleged . . . violation can be properly identified." *Quality Foods v. Latin Am. Agribusiness Devel.*, 711 F.2d 989, 995 (11th Cir. 1983).

In order for a claim of invasion of privacy and false light invasion of privacy to state a cause of action, the plaintiff must allege facts specific enough to put the defendant on notice, not only about the particular claim (invasion of privacy), but also about the grounds therefore (the specific facts alleged to be private). *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1569 (11th Cir. 1987) (quoting the Supreme Court: "Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of vague sympathy for particular litigants").

In the case at bar, the complaint fails to put Bankers, Meehan and Delano on notice as to the specific private facts which McCarty claims are the basis for the invasion of privacy cause of action. Rather, the plaintiff merely concludes that Bankers, Meehan and Delano "published representations of the private facts obtained from the private investigation to the *St. Petersburg Times* and to Florida state investigators." Complaint at ¶¶ 252,259,266, and

60

293. It is still necessary that something be stated that apprises a defendant of the substance of the allegation. *Coon*, 829 F.2d at 1569 (citing a Seventh Circuit case).

Contrary to these allegations, at no time did Delano, Bankers or Meehan disclose to the *St. Petersburg Times,* or anyone else, any of the facts obtained from Rayner's investigation, except for complying with FDLE's agent Zaidra's request that the FDLE be given a copy of Bankers' file on the McCarty investigation.

Furthermore, the depositions, affidavits and other materials to be considered by this Court in ruling on this motion for summary judgment are devoid of any evidence which would support McCarty's allegations that Bankers, Delano and Meehan's published representations of the private facts obtained from Rayner's investigation to the *St. Petersburg Times.*

Summary judgment should also be entered on the invasion of privacy claims because in order to prevail on such a claim the plaintiff must plead and prove that the private facts were published to the general public. *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir. 1989); *Lewis v. Snap-On Tools Corp.,* 708 F. Supp. 1260, 1262 (M.D. Fla. 1989). This plaintiff has failed to do so. The mere conclusory allegation that the alleged disclosure was to the general public or to large numbers of persons does not meet the requirement that the publication be to the general public in such a manner as to be outrageous and certain to become public knowledge. *Steele*, 867 F.2d at 1315; *Snap-On Tools Corp.,* 708 F. Supp. at 1262. By stating that the alleged

61

publication was made only to two entities, McCarty has failed to sufficiently allege this publicity element for publication invasion of privacy.  Moreover, even if the handing over of information to the Florida Department of Law Enforcement can be characterized as a publication, this would still be insufficient to satisfy the publicity requirement because the FDLE cannot be categorized as the "general public."  The alleged publication to the newspaper is also deficient on two grounds. First, the alleged communications to the newspaper were oral, not written, and thus in this context incapable of being defined as a publication. *Cason v. Baskin*, 20 So. 2d 243 (Fla. 1945).  That the right of privacy cannot be violated by word of mouth alone, and mere spoken words cannot afford a basis for an action based on an invasion of the right of privacy.  **Id.**

## IV.  NEGLIGENCE

Counts XXXVI and XXXVII contain plaintiff's negligence claims against Bankers.  Count XXXVI is based on plaintiff's allegations at paragraphs 326 and 330 that Rayner was Bankers's agent, and that Bankers breached the duty of care it owed to the plaintiff because its agent, Rayner, wiretapped McCarty's telephone.  At paragraph 331, plaintiff alleges that Bankers also breached the duty of care it owed to the plaintiff because its agent, Rayner, made representation to third parties which expressly and impliedly stated that McCarty was involved in disreputable activities within his personal life.  At paragraph 334 of the complaint plaintiff alleges that through the negligence of its agent, Rayner, McCarty

has been subjected to distrust, disgrace, and injury to his profession.

In addition to the allegations that Bankers was negligent through its alleged agent, Rayner, Count XXXVI also alleges direct negligence on the part of Bankers. Specifically, paragraph 333 alleges that Bankers was negligent in its retention of Rayner without providing adequate safeguards to protect McCarty from Rayner's unlawful activities and paragraph 329 alleges that Bankers breached the duty of care it owed to McCarty by hiring Rayner to conduct a covert investigation by any available means, without regard to the legality of the means employed.

Since the uncontroverted evidence establishes that Rayner was an independent contractor and not a servant (employee), summary judgment should be entered on the allegations of negligence contained in paragraphs 328, 330, 331, and 334, because those paragraphs seek to impose vicarious liability on Bankers for the acts of its alleged agent Rayner.

Summary judgment should also be entered in favor of Bankers on the allegation contained in paragraph 333 of the complaint that Bankers was negligent in retaining Mr. Rayner because the uncontroverted evidence establishes that a great deal of care went into the selection of Blanton as the lawyer to have the investigation conducted and in Blanton's selection of Rayner. In this regard, Blanton sought from Dino Kitchen, a well respected Tallahassee lawyer, a recommendation for an investigator. Mr. Kitchen recommended Rayner. Blanton was selected as the attorney

63

to have the investigation conducted because the former managing partner of Delano's former law firm had always spoken very highly of Blanton and because Delano held his former law partner in the highest respect because that lawyer had excellent judgment and was an excellent lawyer.

As also noted above, paragraph 329 of the complaint alleges that Bankers breached its duty of care to Mr. McCarty by hiring Rayner to conduct a covert investigation by any available means, without regard to the legality of the means employed. Summary judgment should be entered in favor of Bankers as to this theory of liability because the uncontroverted evidence establishes that Rayner was not hired to conduct an investigation by any available means, without regard to the legality of the means employed. In this regard, in the first conversation between Delano and Blanton, Delano discussed his desire for a legal investigation and Delano's desire for a legal investigation never varied. Delano deposition page 143.

Count XXXVII of the complaint is identical to Count XXXVI except that instead of alleging that **Rayner** was Bankers' agent, Count XXXVII alleges that **Richard Matthews** (the private investigator whom Rayner hired to assist him) was Bankers' agent. Accordingly, summary judgment should be entered as to the claims contained in Count XXXVII for the same reasons that summary judgment should be entered on the claims contained in Count XXXVI.

Counts XXXVIII and XXXIX are identical to Counts XXXVI and XXXVII except that those counts are brought against Meehan, rather

64

than Bankers.   Counts XL and XLI are identical Counts XXXVI and XXXVII, except that they are brought against Delano, rather than Bankers.   Thus, summary judgment should be entered on Counts XXXVIII, XXXIX, XL, and XLI for the same reasons that summary judgment should be entered on Counts XXXVI and XXXVII.

### V.   CONSPIRACY

A civil conspiracy requires an agreement between two or more persons to achieve an illegal objective or an objective by illegal means, one or more overt acts pursuant to that agreement, and resulting injury to the plaintiff.  The essence of an actionable conspiracy is a meeting of two independent minds intent on one common purpose, through expressed or implied agreement to engage in an unlawful act, which results in damages to the plaintiff.

The test is the purpose of the combination, and if there is no intent to achieve an illegal goal then there is no conspiracy, and a malicious intent will not transform otherwise proper conduct into an actionable civil conspiracy.  Therefore, to maintain an actionable conspiracy, the object of the combination must be to accomplish an unlawful purpose or accomplish some purpose by unlawful means.

10 Fla Jur 2d, Conspiracy - Civil Aspects § 1 (footnotes omitted).

Plaintiff has alleged that "Bankers or Messrs. Blanton and Meehan, Delano, Rayner, and Matthews" conspired to violate 18 U.S. Code § 2520 (Count VI), to violate section 934.10, Florida Statutes (Count XII), to tortiously interfere with McCarty's employment relationship with the Department of Insurance (Count XVII), to commit slander (Count XXII), and to commit invasion of privacy (Count XXXII).

Each of these counts allege that "there existed between the defendants Bankers or Messrs. Blanton, Meehan, Delano, Rayner and

Matthews an express agreement, understanding, or conspiracy with a common purpose and design to conduct a covert investigation on the Plaintiff by any available means, without regard to the legality of the means employed . . ." and that "[e]ach defendant performed some overt act in furtherance of the agreement, understanding, or conspiracy."  Complaint paragraphs 75, 128, 172, 211, and 286.

Plaintiff has taken the corporate deposition of Bankers and the depositions of Matthews, Rayner, Delano, Meehan, and Menke.  In those depositions there is not one hint of "an express agreement, understanding or conspiracy with a common purpose and design to conduct a covert investigation on the Plaintiff by any available means, without regard to the legality of means employed".  Furthermore, in none of those depositions is there any hint of an agreement between two or more persons to achieve an illegal objective or an objective by illegal means and one or more overt acts pursuant to that agreement.  Thus, since the essence of an actionable conspiracy is a meeting of two independent minds intent on one common purpose, through expressed or implied agreement to engage in an unlawful act, summary judgment must be entered in favor of the defendants on all of the conspiracy claims.

### III.   CONCLUSION

This Court should enter summary judgment finding that Rayner was an independent contractor and not a servant (employee) of Blanton or Bankers, or Delano or Meehan and that in placing the wiretap Rayner did so for reasons purely personal to himself and in

no part activated by a purpose to serve Blanton, Bankers, or the investigation he had undertaken on their behalf.

This Court should then dismiss the federal wiretap violation counts against these defendants (Counts II, IV, V and VI) because McCarty has failed to invoke this Court's federal question jurisdiction.

This Court should also dismiss the supplemental state law claims against these defendants because (except for the state wiretap violation) the state claims do not form part of the same case and controversy giving rise to the sole alleged federal question (violation of the federal wiretap statute) and because the state law claims predominate over the single alleged federal claim.

For the same reason, this Court should enter summary judgment on McCarty's claims against these defendants for violation of the state wiretap statute, section 934.10, Florida Statutes.  These claims are contained in Counts VIII, X, XI, and XII.

For the reasons stated above, if the Court does not dismiss the supplemental state claims, it should enter summary judgment on the claims for tortious interference with employment relationship (Counts XIII, XIV, and XV), slander (Counts XVIII, XIX, and XX), intentional infliction of emotional distress (Counts XXIII, XXIV, and XXV), invasion of privacy (Counts XXVII, XXVIII, and XXIX), negligence (Counts XXXVI, XXXVII, XXXVIII, XXXIX, XL, and XLI), and conspiracy (Counts VI, XII, XVII, XXII, and XXXII).

Respectfully submitted,

Robert E. O'Quinn, Jr.
Florida Bar No.: 0305782
WEBB, O'QUINN & MURPHREE, P.A.
4035 Atlantic Boulevard
Jacksonville, FL 32207
(904) 399-2900
FAX No. (904) 399-2110
Attorneys for defendants
Bankers Insurance Company,
David Meehan, and George
K. Delano


Douglas A. Mang
Florida Bar No.: 0140290
Wendy Russell Weiner
Florida Bar No.: 0983667
MANG LAW FIRM, P.A.
660 E. Jefferson Street
Post Office Box 11127
Tallahassee, FL  32302-3127
(904)222-7710

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to **Douglas A. Mang**, Wendy Russell Weiner, Connie Jo Pecori, c/o Mang Law Firm, Post Office Box 11127, Tallahassee, FL 32302-3127; **William R. Mabile, III**, Fuller, Johnson & Farrell, 111 North Calhoun, Tallahassee, FL  32301;  **Frederick Bateman, Jr.**, Bateman Harden, 300 East Park Avenue, Tallahassee, FL  32301; and **John C. Cooper**, Cooper, Coppins & Monroe, P.A., 1319 Thomaswood Drive, P. O. Drawer 14447, Tallahassee, FL 32317-4447, by U.S. mail delivery this __18th__ day of October, 1997.

Robert E. O'Quinn, Jr.

04-20-95 04:32PM   FROM 18135702037          TO 19042229166          P001/002



---

**Bankers Insurance Company** ■ **Bankers Life Insurance Company**

---

April 20, 1995

SENT BY FACSIMILE TRANSMISSION
(904-222-9166)

Mr. Edwin Blanton, Esq.
825 Thomasville Road
Tallahassee, FL 32303

Re:  Kevin McCarty Investigation

Dear Eddie:

It was a pleasure to speak with you regarding our needs for an investigation and I very much appreciate your willingness to help. To reiterate, we would like you to hire an investigator on our behalf to investigate Kevin Matthew McCarty. Kevin currently holds a position with the Florida Department of Insurance as Deputy Divison Director of the Division of Insurer Services and reports to Carol Ostapcuk.

As I explained to you, we would like to have a full blown investigation of Kevin McCarty to include any current romantic involvements. We understand there is such an involvement with Carol Ostapcuk. We would like to discover whether there is any criminal record or other record which indicates dishonesty. We would specifically like to investigate current sources of income that might be improper. I have not added more to this list as there is nothing else which occurs to me. However, if you or your investigator think of something else, please share those thoughts with us so that we may consider them.

I explained to you that we have no intention of committing extortion or any such thing. Instead, depending upon what kind of information might be developed it might be appropriate to take it to the Department's General Counsel, to the Commissioner or to the Florida Attorney General.

EXHIBIT
A

04-20-95 04:32PM   FROM 1813570*3037          TO 19042229166         P002/002

Mr. Edwin Blanton, Esq.
April 20, 1995
Page 2


    I understand that you will be meeting with your investigator who will give us some kind of ballpark budget for this effort. It would also be appropriate to establish the basis of our arrangement with you.

    Thanks again for your help.

                Very truly yours,

                G. Kristin Delano

GKD/nh

# TER Rayner

## I N V E S T I G A T O R

| k. End | | Emp. | ED BLANTON | | Style Case | UNKNOWN vs McCARTY #1 |
|---|---|---|---|---|---|---|

| Date | Day | Start | Finish | Total | Miles | Exp. | Explanation |
|---|---|---|---|---|---|---|---|
| 26/95 | Wed | 1500 | 1630 | 1·5 | 20 | | Case assignment @ E.B's office |
| 02/95 | Tues | 1400 | 1530 | 1·5 | 22 | DMV #16·00 | Research @ DMV. |
| 09/95 | Tues | 1000 | 1100 | 1·0 | 22 | DMV #2·50 | Vehicles history. |
| 19/95 | Fri | 1100 | 1400 | 3·0 | 26 | DMV #12·00 | Research DMV + Division of Corps. |
| " | " | 1530 | 1630 | 1·0 | | Park #2·00 | — " — Leon County Court house |
| 22/95 | Mon | 1000 | 1200 | 2·0 | 28 | | Check locations old address. |
| " | " | 2130 | 2230 | 1·0 | 26 | | Check current address. |
| 24/95 | Wed | 0830 | 1100 | 2·5 | 22 | DMV #18·00 | Crash reports @ DMV. |
| " | " | 1300 | 1500 | 2·0 | | PK #2·00 | Research @ Division of Corps. |
| " | " | 1930 | 2000 | 0·5 | 26 | Finance A= #650 = | Spot check subject's residence |
| " | " | 2230 | 2330 | 1·0 | 26 | | " " |
| 25/95 | Thus | 1430 | 1730 | 3·0 | 24 | DMV #4·00 | Research @ DMV + Court house |
| 21/95 | Fri | 0830 | 1000 | 1·5 | 20 | PK #2·00 | Meeting @ E.B's office |
| " | " | 1730 | 1830 | 1·0 | 26 | | Spot check subject -residence |
| 28/95 | Sun | 1830 | 1930 | 1·0 | 26 | | " " " " |
| 29/95 | Mon | 1630 | 1730 | 1·0 | 26 | database #360·00 | " " " " |
| | | | | 24·5 | 340 | | Invoice: 95-118. |

EXHIBIT

B

# Rayner

### I N V E S T I G A T O R

| k. End | | Emp. | ED BLANTON | | Style Case | UNKNOWN VS McCARTY #2 |
|---|---|---|---|---|---|---|
| Date | Day | Start | Finish | Total | Miles | Exp. | Explanation |
| 01/95 | Wed | 1900 | 2000 | 1·0 | 26 | Three #9.41 | Spot check of subject residence |
| " | " | 2130 | 2230 | 1·0 | 26 | | " " " |
| 14/95 | Fri | 1500 | 2330 | 8·5 | 40 | | } Surveillance (2-man team) |
| " | " | 1700 | 2300 | 6·0 | 40 | | } Assisted by RM. |
| 15/95 | Sat | 1330 | 1430 | 1·0 | | | Surveillance — McCarty |
| " | " | 1900 | 2200 | 3·0 | | | " |
| 16/95 | SUN | 0000 | 0300 | 3·0 | 96 | | " |
| 18/95 | Tues | 2130 | 2230 | 1·0 | 26 | | Spot check subject's residence |
| 19/95 | Wed | 0600 | 0900 | 3·0 | 33 | | Surveillance of Zutell |
| 20/95 | Thurs | 0645 | 0915 | 2·5 | 36 | | Surveillance of Finzen |
| 21/95 | Fri | 2030 | 0030 | 4·0 | 32 | Data #50.00 | Surveillance McCarty |
| 22/95 | Sat | 1400 | 1530 | 1·5 | 28 | | Spot check all residences. |
| " | " | 2030 | 2300 | 2·5 | 41 | | Surveillance McCarty |
| 23/95 | Sun | 1000 | 1100 | 1·0 | 28 | | Spot check all residences |
| " | " | 1215 | 1245 | 0·5 | | | " — " |
| " | " | 1345 | 1415 | 0·5 | | | " — " |
| " | " | 1515 | 1545 | 0·5 | 30 | | " — " |
| 24/95 | Mon | 1330 | 1500 | 1·5 | 20 | | Meeting atty E.B's office. |
| | | | | 42·0 | 502 | | Invoice: 95-157 |

# Rayner

T E R

I N V E S T I G A T O R

| Date | Day | Start | Finish | Total | Miles | Exp. | Explanation |
|------|-----|-------|--------|-------|-------|------|-------------|
| k. End | | Emp. ED BLANTON | | | Style Case | | UNKNOWN vs McCARTY #3 |
| 7/26/95 | Wed | 1930 | 2030 | 1-0 | 26 | | Spot check known residences |
| 7/27/95 | Thurs | 0615 | 0715 | 1-0 | 26 | | " " " |
| 7/28/95 | Fri | 1600 | 0030 | 8-5 | 30 | | Surveillance McCarty |
| 7/29/95 | Sat | 0730 | 1330 | 6-0 | 77 | | " " |
| 8/01/95 | Tues | 1530 | 2200 | 6.5 | 32 | DMV #4.50 | Surveillance Zutell |
| 8/02/95 | Wed | 2130 | 2400 | 2.5 | 46 | | Surveillance McCarty |
| 8/03/95 | Thurs | 0600 | 0700 | 1-0 | 26 | | Spot check known residences |
| 8/04/95 | Fri | 1830 | 0030 | 6.0 | 54 | | Surveillance McCarty |
| 8/05/95 | Sat | 0800 | 0330 | 19.5 | 135 | drinks $8-00 | " " |
| 8/06/95 | Sun | 0900 | 0030 | 15.5 | 76 | database $50-00 | " " |
| 8/07/95 | Mon | 0500 | 0600 | 1-0 | 26 | DMV #14.50 | Spot check known residences |
| | | | | 68.5 | 554 | | Invoice 95-123 |